UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-20403-CR-DIMITROULEAS

UNITED STATES OF AMERICA

vs.

OSCAR DAVID PULGARIN-GANAN,
    a/k/a "Niño,"
    a/k/a "Coroso,"

    Defendant.
_____/

## STIPULATED FACTUAL PROFFER

If this matter were to proceed to trial, the Government would prove the stated facts beyond a reasonable doubt. The Parties agree that these facts, which do not include all facts known to the Government and the Defendant, **OSCAR DAVID PULGARIN-GANAN, a/k/a "Niño," a/k/a "Coroso,"**, are sufficient to prove the guilt for **Count 1**, that is, from in and around 2002 through on or about June 4, 2015, in the countries of Colombia, Venezuela, Ecuador, Guatemala, Panama, Honduras, Costa Rica, Nicaragua, Mexico, and elsewhere the defendant, violated Title 21, United States Code, Section 963.

More specifically, during the middle of 2009, DEA Agents began investigating Oscar David **PULGARIN-GANAN**, a Medellin, Colombia based drug trafficker. **PULGARIN-GANAN** worked in drug trafficking ventures with various defendants who were prosecuted in the Southern District of Florida. **PULGARIN-GANAN** partnered with various other significant drug traffickers who conspired to send cocaine from Colombia to Panama, Honduras, Guatemala and Mexico. The cocaine was ultimately destined for the United States. **PULGARIN-GANAN** had an ownership interest in cocaine shipments, and also coordinated

sending the cocaine from Colombia by aircraft and go-fast boats.

A cooperating witness (CW1) debriefed to Agents that he met with Oscar David **PULGARIN-GANAN** and was recruited to be the pilot on a drug flight for **PULGARIN-GANAN**. According to CW1, he was introduced to **PULGARIN-GANAN** by Hernan LNU who works at the Olaya Airport in Medellin, Colombia around the middle of 2014. Hernan LNU called CW1 and asked CW1 if he could fly a Sabreliner Jet aircraft. When CW1 expressed an interest in piloting the drug flight, Hernan LNU put CW1 in direct communication with **PULGARIN-GANAN**. CW1 understood from his initial conversations with **PULGARIN-GANAN** that the request was to fly a drug shipment. CW1 stated that he asked for $10,000 up front and would eventually be paid substantially more for actually flying the shipment of cocaine. **PULGARIN-GANAN** met with CW1 in Panama City, Panama in the months leading up to November 2014 on numerous occasions. CW1 began taking flight instruction from a Panamanian based flight instructor. **PULGARIN-GANAN** paid for the flight instruction received from Barmes. **PULGARIN-GANAN** directed CW1 to an aircraft bearing tail number N100EJ which was located at the Albrook Airport in Panama City, Panama.

CW1 told Agents that he received flight instruction for at least one or two months and that **PULGARIN-GANAN** paid for a flight mechanic to travel from Chicago, Illinois to Panama City, Panama on at least two occasions to conduct maintenance on the Sabreliner. **PULGARIN-GANAN** provided the co-pilot to CW1. Additionally, **PULGARIN-GANAN** frequently met with CW1 to receive updates on the status of their flight training and the condition of the aircraft.

In September or October 2014, CW1 received $30,000 US Dollars from **PULGARIN-GANAN**. A representative of CW1 received the money on behalf of CW1 in

Medellin, Colombia. The test flights and the repair of the Sabreliner continued until **PULGARIN-GANAN** showed up to the hangar where the airplane was stored while CW1 and the co-pilot were there around November 1st. CW1 stated that **PULGARIN-GANAN** was angry that they had not yet departed to pick up the drugs in Apure, Venezuela and transport them to Honduras. During various conversations between CW1, the co-pilot and **PULGARIN-GANAN**, **PULGARIN-GANAN** laid out the plan to CW1 and the co-pilot. **PULGARIN-GANAN** stated that they would depart Howard Airport in Panama City, Panama and travel with a flight plan to Aruba. When they arrived close to Aruba, they were to turn off their transponder and fly to coordinates that were provided by **PULGARIN-GANAN** to a clandestine air strip in Apure, Venezuela. **PULGARIN-GANAN** would provide them both entrance and departure coordinates for both Venezuela and Honduras. Additionally, **PULGARIN-GANAN** agreed to provide a radio channel so that CW1 and the co-pilot could speak with the ground crew located at the clandestine air strip. CW1 and the co-pilot were to pick up 1,200 kilograms of cocaine and immediately depart for Honduras to the clandestine airstrip there.

On November 3, 2014, CW1 and the co-pilot arrived at Howard Airport in Panama City, Panama to fly the Sabreliner to pick up the cocaine in Venezuela and deliver it to Honduras. **PULGARIN** was in Panama City, Panama at the time and maintained communication with the co-pilot by telephone. When the co-pilot and CW1 boarded the aircraft, the co-pilot pulled out some pieces of paper with entrance and departure coordinates on them. The co-pilot relayed to CW1 that the coordinates, the telephone number for the persons on the ground in Venezuela receiving the airplane at the clandestine air strip, and the satellite telephone number for the phone they were carrying, were all on a paper. The co-pilot showed this paper to CW1 and CW1 and The co-pilot input the coordinates into an aviation GPS that was aboard the aircraft. CW1 and

The co-pilot departed Howard Airport in the late morning of November 3, 2014.

CW1 told Agents that approximately 1 hour into the flight, CW1 became nervous about turning off the transponder and dropping down into Apure, Venezuela and landing a jet airplane on a dirt airstrip in Venezuela. CW1 decided to terminate the trip by pretending that there was a pressurization emergency in the plane. According to CW1, the co-pilot wasn't competent enough to know whether or not the pressurization was correct or not. CW1 explained to The co-pilot that they were going to return to Panama in order to have the aircraft repaired and then would attempt the flight again on another date. CW1 received tower authorization to return to Panama. CW1 stated that he purposefully landed the plane at a high rate of speed in order to run the plane off of the end of the runway. The plane crashed at the end of the runway and was heavily damaged. CW1 stated that there were approximately 500 gallons of fuel contained in drums in the passenger compartment of the aircraft and when the plane would run low on fuel there were bladders that connected to the wings to pump the fuel from the interior of the aircraft to the fuel tanks in the wings. CW1 and the co-pilot were concerned that the fuel in the drums would explode after the crash. They left the airplane running after the crash and ran from the scene. CW1 stated that a short time later, he returned to the aircraft, turned the engines off and then again fled the scene.

CW1 told Agents that when **PULGARIN-GANAN** found out what had happened, **PULGARIN-GANAN** became very angry and summoned CW1 and the co-pilot to a meeting at a mall in Panama City, Panama. During this meeting, **PULGARIN-GANAN** interrogated both CW1 and the co-pilot as to what occurred and whether or not there was a real emergency. **PULGARIN-GANAN** told CW1 and the co-pilot that he was going to lose the 1,200 kilograms of cocaine that was waiting in Apure to be picked up and he was very concerned and angry about that. CW1 offered to participate in the purchase and delivery of a replacement aircraft for

PULGARIN-GANAN and to do so immediately. CW1 stated that PULGARIN-GANAN paid CW1 approximately $3,000 in cash at the mall and instructed CW1 to find another aircraft. PULGARIN-GANAN has since been debriefed and admitted to the details and his participation in this load.

In 2011 PULGARIN-GANAN was working with high level members of the Usuga/Urabenos DTO. According to Pulgarin, he in concert with the Usuga/Urabenos Clan and Victor Mosquera, another indicted co-conspirator, were involved in a load of 1000 kilos that was sent from Necocli, Colombia to Honduras. This load was seized by the U.S. Coast Guard at the Panama/Costa Rica border.

In 2013, PULGARIN-GANAN and his co-conspirator member of the Clan Usuga/Urabenos DTO asked other co-conspirators to use his Honduran contacts to rescue the crew members of a vessel that had been scuttle in the ocean. The boat carrying the cocaine was sent by by Clan Usuga/Urabenos DTO members and left from Necocli, destined first for Honduras with the ultimate destination being the United States. The co-conspirators were ultimately successful in rescuing the crew members and facilitating their return to Colombia.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 11/5/15    By: _____
MICHAEL B. NADLER
ASSISTANT UNITED STATES ATTORNEY

Date: 11/5/15    By: _____
JOAQUIN PEREZ
ATTORNEY FOR DEFENDANT

Date: 11/5/15    By: _____
OSCAR DAVID PULGARIN-GANAN
DEFENDANT

Susana Starosta
Official Spanish Interpreter
11/5/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA
    Plaintiff,

CASE NO. 15-20403-CR-DIMITROULEAS

vs.

OSCAR DAVID PULGARIN-GANAN
    Defendant

## AMENDED ORDER GRANTING CONTINUANCE

This matter having come before the Court on Defendant's Motion for Continuance. After due consideration, it is

ORDERED AND ADJUDGED that this case is hereby continued to the two-week trial calendar commencing November 9, 2015 at 9:00 A.M. o'clock, or as soon thereafter as the case may be called.

**COUNSEL AND DEFENDANT(S)** shall report to a Calendar Call to be held on FRIDAY, November 6, 2015, at 9:00 a.m. o'clock. It being further

ORDERED that the period from the date of this order to the time of trial shall be deemed excludable in computing the time within which the trial of this case must commence pursuant to Title 18, U.S.C., Section 3161(h)(8)(A), this Court finds that the ends of justice served by continuing the trial outweigh the best interest of the public and the defendant(s) in a speedy trial.

DONE AND ORDERED this 10th day of September, 2015.

*[signature]*
WILLIAM P. DIMITROULEAS
United States District Judge

cc:    Michael Nadler, AUSA
       Scott Kalisch, Esq.